My apologies. I'm ready to go if the court is, if the floors are. Our third case is 24-1401 Gautier v. Tams Management, Inc. Mr. Ruby. Thank you, your honor. May it please the court, Steve Ruby for the appellants. The crux of this appeal, your honors, is that the plaintiff neglected to prove an essential element of his case at trial, that he was employed by a qualifying employer under the WARN Act. Now he asks this court to extend WARN Act liability in an unprecedented fashion and impose liability on a separate company, Tams Management, that was not a parent or a subsidiary of any of the other defendants. The court declined to do that in the Pennington case in 2019, and it should decline the invitation to upend the precedent from Pennington today. The WARN Act, your honors, requires a plaintiff to prove six elements. The second of those is that the plaintiff works for a qualifying employer, a qualifying employer as pertinent to this case as one that has at least 100 employees. It's undisputed in this case that Tams Management, which was the plaintiff's employer, Mr. Gautier's employer, did not have 100 employees. And so the plaintiff has relied upon a single employer theory under which, in certain circumstances, multiple business entities can be aggregated together to meet the 100 employee threshold required to trigger the WARN Act. There's a DOL regulation, 20 CFR 639.3A2, that governs whether multiple employers can be aggregated into a single employer for purposes of the WARN Act analysis. And the problem with the plaintiff's case is that he neglected at trial to present evidence to the jury that could sustain a finding that Tams Management was part of a single employer for WARN Act purposes. What about all the testimony at trial? Do you not think that the testimony is evidence? Your Honor, we don't believe that the testimony that was presented was sufficient to, and I'm happy to go through that piece by piece, Your Honor, or factor by factor. We don't believe that the testimony was sufficient to establish any of the five factors that control the single employer inquiry under the DOL regulation. And you mentioned Pennington, and Pennington's a big part of your case. But Pennington is distinguishable from this case, isn't it, because there were no common directors or owners, and they were operated as separate entities in Pennington. And here, I mean, the justice, the entire justice family appears to be, it appears that they were running the show at this company, at all the companies, at all five entities. So Your Honor, and I'll take that piece by piece, Your Honor's comment mentioned ownership, directorship, as well as oversight of operations. And those go to multiple factors in the DOL regulation. The first factor, and this goes to Your Honor's question, is common ownership. That's certainly one of the factors under the DOL regulation. And part of the problem with the evidence the plaintiff presented at trial is that there was no evidence presented to the jury that Tams had any common ownership with the other defendants. There was, and I believe that's going to be the same. Why were they having weekly conference calls with Jim and Jay Justice about the operation of the business? Your Honor, I think that factor, and again, there was no evidence presented to the jury on the ownership of Tams. There was evidence presented that there were conference calls with Jim Justice, that there were conference calls with Jay Justice. I think the plaintiffs have discussed that under the factor of de facto exercise of control, which is the third factor in the DOL analysis. There's no evidence that, first of all, that Tams, which is Mr. Gautier's employer, exercised any control over any of the other defendants. There's also no evidence of which of the defendants. If any of the defendants, the justices were acting on behalf of when they had these weekly conference calls. In other words, were they acting on behalf of Tams? What about when they showed up there? Didn't they show up at the job site on occasion, Jim and Jay Justice, to oversee, I assume to oversee operations? That was the testimony, Your Honor. But I'll analogize that to the situation in Pennington. Did Jim or Jay Justice testify in saying that we didn't do that? They did not, Your Honor. But it's the burden, of course, of the plaintiff to establish that there's a single employer under the DOL regulation analysis. In Pennington, the situation, as I know the court's aware, is that there were three levels of supervision. There was a utility company that was the principal in constructing a nuclear power plant. Westinghouse was the general contractor or a contractor in constructing the nuclear power plant. Fluor was a subcontractor for Westinghouse. And the facts there, I think, are analogous to the facts here, Your Honor, in that there were personnel that were on site from the utility. There were personnel that were on site from Westinghouse, which was the contractor which had the authority to give direction and to coordinate the work that was being done at the site, even if that work was being done by Fluor. But the touchstone, the central principle from the Pennington case, when it considered those facts, is that a degree of coordination, that's the critical phrase from Pennington, a degree of coordination is not sufficient to establish single employer status. I don't think there's any doubt that the testimony that is What did you say? A degree of what? A degree of coordination, Your Honor. All right, a degree. But here, at least from the testimony, the jury could conclude that this was total coordination. Your Honor, we don't agree with that. And perhaps they did conclude that. We don't agree that the testimony would establish that, but we also don't believe that with regard to the, if you look at the totality of the DOL regulation and the five factors that have to be established, first of all, there was no evidence of common ownership between TAMS management and the other defendants. There was no evidence presented at trial. Why do you say that? I know there weren't formal documents, but employees and other people testified that, oh, you know, the justices own this one, they own that one. You know, that's testimony, that's evidence. You might think it's incorrect. People called TAMS a subsidiary of other companies. That might be wrong. But it's evidence, isn't it? And you're supposed to present evidence to oppose that. Judge, I don't believe there was any evidence in the record specifically of the ownership of TAMS management. There were statements about that the justices, there was an affidavit, and it's important, I think, not to conflate the affidavit that was presented at an earlier stage of the proceedings, which reflected that the owners were a pair. The affidavit wasn't in front of the jury, but people testified calling them all the justice companies, TAMS, Bluestone, all of them. Now this, I mean, this factor's not make or break. There are other factors in the analysis, but I hesitate when you say there was zero evidence on this. It may not be great evidence, but there was some evidence. Your Honor, we would not, our view is that the evidence, and I know the testimony that Your Honor's referring to is saying that these were the justice companies, that that is not specifically evidence at all with respect to the ownership of TAMS management. There was evidence that TAMS had two directors in common with one of the other defendants, BII, Bluestone Industries. There was no evidence of common directorship with any of the others. There was evidence that TAMS had some common officers with two of the other defendants, BII and PACAR, but no evidence of any common officers with Bluestone Resources, which was the parent of the other three defendants. Well, what was the jury to make of Mr. Graham's testimony, who's BRI's Senior Vice President of Human Resources, that the various entities that were operating at the Burke Mountain Complex were functionally the same company? From that, couldn't a jury conclude that they were functionally the same company? Your Honor, the jury, Mr. Graham never mentioned, and his testimony is relatively brief, the portion that's included in the joint appendix, and it begins at Joint Appendix 239. Mr. Graham never mentioned TAMS management at all. The other companies were, the Bluestone companies were- Was there testimony from some of the witnesses that they got some payments from BRI? There was one- So, yes- I'm sorry, Your Honor, BRI, Bluestone Resources? Mm-hmm. I think that's correct, Your Honor, but- Was there testimony that all these entities shared the same P.O. box? I believe there was testimony- And was there testimony that all these entities had the same principal place of business? Yes, Your Honor, but again, none of that goes to the, that doesn't establish any of the factors. The fact that these may be operated in the same place, they can even, in fact, in the Third Circuit cases, in Pearson, and in tech controls, the principle that's articulated there is that even if you can establish common ownership and common management, and incidents that might be expected in that situation, such as a common P.O. box or a common place of business, that's not enough to establish single-employer status under the warning. When your time's ticking down, do you want to address the jury instruction issue? Yes, Your Honor, I'd be happy to, and our point there is fairly straightforward. We don't believe that the court needs to reach that issue, of course, but if it does, that issue concerns an erroneous jury instruction. I think that my colleagues on the other side of the aisle, I think we may be ship's passing in the night here in terms of what our argument is. Our argument is not anything to do with the offer that was made to Mr. Gautier to come back to work after a few months. That's, I think, primarily what plaintiff responded to in their response brief. The argument here is that under the WARN Act, there are three kinds of employment laws, termination, layoff greater than six months, or reduction in hours greater than 50% for six months. Under the Leeper case from the Seventh Circuit, those three kinds of, or three categories, of employment laws are mutually exclusive. And I thought you said in your brief that if the court had presented these as alternatives, that would not have been a problem. Mutually exclusive alternatives, Your Honor. They can't. So I was confused by that, because in the jury instruction, the court says, now we're gonna talk about employment laws. If you find 50 or more were not terminated from employment, on such and such dates, the plaintiff next asks you to consider if 50 or more of the defendant's full-time employees suffered a disqualifying reduction, or suffered a qualifying reduction in hours. So that sounds like alternative language to me. The court said, if you find, if you don't find the first category, then the plaintiff asks you to go on and address this second category. And, Your Honor, our premise is that the jury should have been instructed that they could only find one of those. And that in this case, when there were only 91 members of the class, the jury's finding of, that there were 50 employees, 50 class members, who were terminated, and also 50 class members who suffered a recognizable reduction in hours, those findings are mutually exclusive. They're not mutually possible. You might have a problem with what the jury put on the verdict form, right? That they found both. Maybe they misunderstood the instruction, or they just wanted to belt and suspenders and make sure that they communicated what they thought. Maybe they got it wrong. But it's not a problem with the instruction, right? The instruction presented it in alternatives, right? Our position at trial, Your Honor, was that the jury should only be instructed on one. In other words, that the plaintiff should have to pick. And I see my time is up, but if I may, I'll finish answering Your Honor's question. Go ahead. That the jury could only be instructed on one of those bases, and the plaintiffs had to choose one. And if we had prevailed at trial on that, and if the court had not made what we believe to be the error in the instruction, then the jury would have made a finding that made logical sense. Because of the error, the jury made a finding that's logically contradictory, given the number of members of the class. Counsel, can I follow up on that question, Judge Rushing's question? If we don't agree with you that the instruction was incorrect, but might have some sympathy for an argument that the jury verdict was inconsistent as a result of the findings of the jury, was that argument preserved? Because I don't see anything in the record that indicated that you were, I don't know if you tried this case below, but whoever tried the case objected once the jury verdict came in. Your Honor, I understand the question. I did not try the case below. I believe that we would have adequately preserved the argument by our objection to the form of the instruction, that if the instruction had been properly given, it would have been impossible to reach the inconsistent finding, and that the objection in that regard would be perhaps not ideal, but sufficient to preserve the issue. All right, thank you. Thank you, Your Honor. Mr. Petzon. Thank you, Chief Judge Diaz. It is also for me an honor to appear here and meaningful to me and to our client class to appear and be heard by this honorable court. Thank you. A properly instructed jury had abundant information on every relevant factor to determine the defendants comprised a single employer under the Warren Act, and that they terminated more than 50 full-time employees within the class period. There was no contrary evidence to indicate anyone other than the defendants terminated all of the relevant employees. The defendants' entire focus has migrated, really shifted diametrically during the course of this case after they lost three times on summary judgment and at trial. The defendants' whole emphasis throughout the briefing was that they were a single employer and that they should get some credit and some offsetting consideration for trying to rehire employees during the class period, an argument that you heard Mr. Ruby say they've abandoned now, they're not here to make that argument. And so we thought we were all in agreement that they were a single employer, that was the argument they were making in their defense all the way through this case. So the fact that they rehired a few people at the 11th hour, it's the case that they did make one or two phone calls to some of the class members two days before they filed their answer in this complaint. And when you say they made some phone calls, it's the phone calls to try to rehire them, right? Yes. And who was it that called them? Yes, Your Honor, that's exactly right. Was it Mr. Graham? It was Mr. Graham. Who worked for whom? He was the Vice President of Human Resources for Bluestone Industries and every other defendant. Yeah, and he testified without contradiction in the record that he had hiring and firing authority for all the defendants. And I think he also testified that they just switched employees back and forth between companies. That's at JA-241. That's at JA-240, 241. Yes, Mr. Graham testified he had common hiring and firing at JA-239 and 40, and then he goes on at 240 and 41, as you note, Your Honor, that there was an exchange employees back and forth and machinery back and forth. And you know, under the WARN Act, you also have to show that the layoff or termination of the employment loss occurred at a single site of employment. And these factors kind of commingle, and the defendants have not challenged the holding that the affected Burke Mountain Mine Complex was a single site of employment. Part of what we showed to prove that was commingling of equipment by the defendants, equipment and employees. So it's sort of a half-hearted argument here to argue that we failed to show they were single employer, but that they're not challenging the finding of single site employment, which relies on the same facts and commingling of employees and equipment.  as you note, Your Honors, the Pennington case consciously distinguished itself from a case in which there are common directors and owners. And Judge Wilkinson said in that opinion that this was a case involving a major utility company, which had contracted with Westinghouse and the Fluor Corporation, totally distinct companies. And Judge Wilkinson's acknowledged that this would be a totally different case if it involved wholly owned or closely held subsidiaries. And as to Your Honor's question, it's about the evidence regarding common ownership. I think Judge Rushing, you made the point that was certainly testimony about common ownership, but it's important to note that when Mr. Ruby says, we only showed that TAMS had two directors in common with the other defendants, and we didn't show more. Well, the reason we didn't show more is that TAMS only has two directors at JA366, and those two directors happen to be Jay and Jill Justice. And so, and that also, JA366 is the stock certificate or the Secretary of State's records on that entity, which show that all capital stock was held. It doesn't show the proportion, how much Jay owned versus how much Jill owned. And that's basically what they were arguing. We didn't adequately prove that, but that's really immaterial. And of course, the standard here, Your Honor, and Judge Thacker, I know you've thought about the standard for reviewing jury verdicts, and your court today has asked about the relevant standards. And as long as the evidence is within the range of the accredited testimony, the jury's verdict should be upheld. And certainly here, the court heard, and the jury heard evidence on every element of 20 CFR 639-3, common ownership, common directors, de facto exercise of control, which in the Pearson case in the Third Circuit and in the Pennington case, which generally followed Pearson, de facto control of the employment event, the adverse employment action giving rise to the claim is the principal factor of interest to the Warren Act. Judge Wilkinson set out the legislative history of the Warren Act, and it's intended to prevent major community disruptions from mass employment. And so the entity that's actually making the decision to disrupt the community is the most important factor under Pennington and under Pearson. And here, all of the evidence about de facto exercise of control went to the commonality of the control by the Bluestone integrated entity. Can I ask you a factual question about that? Is it right that Billy McClung is who informed the plaintiff that he was being terminated? As to the class representative, yes. The representative. And he's employed by Bluestone Industries? That was the uncontradicted testimony, yes. He was not on the payroll of any of the other subsidiaries. And so was Tiger Lambert. Tiger Lambert was also not on the payroll of any of the subsidiaries. And he was, he was, he was a, the superintendent of the job site, Albert Grimmett, testified in this case, and I can give you the JA citation, but he testified that Lambert was a Bluestone, yes. Both parties seem to say that in their briefs, the defendants also say that these two were employed by Bluestone Industries, but I wasn't sure about the records, so I just wanted to confirm. Yes, they were, in fact, they received a lot of compensation from a variety of sources, but they are, it's not disputed, they were agents of the principal, not any of the subsidiaries in this case. So we showed also the dependency of the operations. Again, Mr. Graham's testimony and all the rest of the plaintiff's evidence goes to the dependency of the operations. Really, in order to preserve an argument about codependency of the operations in a Warnack case, you have to challenge the finding that the mass layoff or plant closure occurred at a single site of employment. And what we showed, and it's not been disputed here, that there were plaintiffs to give it one, JA-185, there were common work permits, there were all affiliated employees. Josh Lilly testified about that. There was a map of all the permits in the record here the jury saw showing that where on the job site the defendants intermingled personnel, equipment, mining permits. There was, the processing of coal occurred at that site too, which is an integral part of a coal mining operation. Albert Grimmett at JA-217 testified about the codependency of the operations. At plaintiff's exhibits two and three were the job listings for the workers during the period. All of the workers from, all the defendants were listed jointly on a single job listing, assigning the shifts and assigning the work at the job site. That maintenance of payroll records is a factor that this court looks to for joint employer under Dalton against Omnicare and joint employer analysis. Generally, you look at the economic realities. So the, for the codependency operations, you got your work lists that support that conclusion in the record. Common directors and owners, we've been over that. Plaintiff's exhibits four through nine showed as to all of the defendants, they had the same directors, they had counsel stockings held by all of them. Payroll records were admitted, plaintiff's exhibits 13 through 15, JA-373 through 382 summarizes those, showing that those miners who were all under the same direction, who were all working at the same site, were all employed by, in various fashions, by a hodgepodge of these defendants, but they were all operating the same business at the same site. And again, it's important the defendants have not challenged the single side of employment, holding below in this case. I want to shift, if I may, your honors, but let me, before I shift away from single employer, there was also check history reports that were admitted into the record through Ms. Leslie Wells, who was the payroll officer for Bluestone Corporate Parent, and those were summarized in the record and authenticated at JA-247 by Ms. Wells. So payroll records, common control of payroll records also supports the jury's readable conclusion. And of course, Mr. Graham's testimony. The court relied, at summing up on single employer, the court relied on all of these factors I've just recited in denying the defendant's renewed motion for judgment as a matter of law. At JA-419, the district court does a nice job of summarizing this evidence that I've just summarized. And the court then goes on to address the second issue that the defendants are arguing here. Let me get to that, counsel. Yes, Judge. I have a question about the sufficiency issue. And at the very beginning, not today, but in your brief, I recall you, you seemed to suggest that we don't even need to get to the merits of all of this because it wasn't properly preserved in the renewed motion for judgment as a matter of law and that the argument as to sufficiency was relegated to a footnote. Do you want to say any more about that? I mean, it seemed like the district court engaged with it nonetheless, and that might be enough to get it over the hump. Although I think I would agree with you that that's not the best practice. Well, this may be akin to a situation where someone raises an equitable issue and gets a result that's at odds with what they were reckoning for and then tries to preserve it with an assertion of error. But the reason we felt like they waived this issue of single employer is that they were making the contrary argument below. So they were arguing they were a single employer and that they deserved a damages offset or some credit for rehiring the employees. They were arguing they were a single employer, so we felt they waived the argument that they were not a single employer. And when they lost for the fourth time on the argument about credit for rehiring, then you're right, I think it's reflected in a footnote and it may have been voiced verbally at the conclusion of trial that they took exception to the verdict at that point. But they hadn't presented any argument or evidence about that throughout the trial. They had been arguing our side of that issue, Your Honor. So I think you're about to get to the second part of the argument that has to do with the verdict. And I have a gap question, which is always a dangerous thing for lawyers to engage in. So as I understand the law in this case, had to show either that 50 plus employees were terminated as consistent with the act and or that they suffered a qualifying reduction in hours. And if my record recollection is correct, there were a total of 93 employees subject to the class. So, and it seemed like the jury found both of those in its verdict, but that doesn't, that seems to not add up because, well, you tell me, does it add up and why? Well, it's, there were only 91, you're correct, there were only 91 full-time employees shown in this record to have been terminated from employment during the class period. So that is the case that you couldn't have had 50 employees terminated from employment, from full-time employment and 50 other employees terminated, reduced in hours. During each month of the six months of this class period. But the defendants of this state in their briefing that the class was only 90, they're actually, there were over 160 members of the class. You don't have to be a full-time employee to be an affected employee. Did it have to be other employees? Perhaps the jury thought it was the same 50. Exactly, Your Honor. 50 hours to zero hours is a reduction in hours. So check yes, if you're the jury. And then were the 50 of them terminated? Yes. That's right. So perhaps the jury did not see those as factually inconsistent or mutually exclusive. That's right. But as Judge Rushing and Your Honors indicated, intimated in your questioning, the instruction directed the jury to make those findings and it's only to reach the fourth interrogatory if they found in the negative for the first interrogatory. So the court tried to tell them, don't do both of these things or you don't need to do both of these things. So the answers to the first three special interrogatories are fully sufficient to support the verdict here. And you don't need to address the question of Chief Judge Diaz as to whether it was an inconsistency in the way that the jury answered the fourth interrogatory. Because as your questioning indicated, they fully resolved those. In every way in which the jury answered the interrogatories pointed toward liability. That's not an inconsistency in liability or in their way of thinking. There's no confusion as to which side they were on. Exactly, Your Honor. And then this gets to the defendant's last point about the Leiper case. And the Leiper case is, Leiper is limited in its holding about the incompatibility of the elements of an employment loss under the WARN Act. All that the Leiper court said is that an individual employee cannot experience logically both a layoff that lasts six months and a reduction in hours of more than 50% during each month of a six month period. Because they found that those things were incompatible. You can't be reduced in hours and also fully laid off. But the Leiper court also said and acknowledged that you may be both terminated from full-time employment. Which is a determination that turns on your perception at the time you're terminated. It's not a hindsight-driven inquiry. The Leiper court held this. This court has held it in graphic communications against Kebacor as well. Leiper doesn't even stand for the proposition that Mr. Ruby's suggesting here that a termination for an individual employee is inconsistent with a reduction in hours of 50%. And just as you suggest, Judge Thacker. How is it not though, if under your interpretation of Leiper, termination is about the perspective at the moment that it happens. But the employee couldn't both think I'm being terminated forever and also think my employment is just being reduced by 50%. Well, their state of mind's not relevant to the mathematical question of whether they have been reduced in hours more than 50% during each of a six month period, Your Honor, that's the difference. So you're disagreeing that these three categories are legally distinct? I'm disagreeing that termination is inconsistent with reduction in force. Leiper says lay off for six months. If you're laid off for six months, they say you don't work any hours during the six months. That's inconsistent with a reduction in force. But the subjective inquiry of whether you were terminated in month one, you may answer that in the affirmative as the jury did. And then also, now the record here does not show that anybody was called back at the 11th hour. But hypothetically, had they been, those things are consistent. You could have understood and moved all these people said, they told us the job was shut down, we had to move on. That can happen. And then if you get an 11th hour phone call in the last week of the fifth month, you've experienced both the reduction 50% for six months and a subjective termination, Your Honor. So those things are conceptually, the jury could have answered both of those as to the same individuals. But certainly, Leiper doesn't say that you can't have 45 people, for instance, who are terminated and five people who are reduced in hours. And the jury certainly could have thought that. And here, there was the most evidence at trial, Leslie Wells suggested two people were actually restored during that last couple of weeks of the fifth month. So jury could have thought 48 people were terminated, two were, you can add those together to get an employment loss under the WARN Act. Leiper doesn't say you can't. Leiper doesn't say you can't add together a layoff of six months for 48 people and two or three others get reduced in hours. It's just not for one individual person. You can't have both a six month layoff and a reduction of 50% for six months under Leiper. But this court doesn't need to get into that here because, as you suggest, Judge Thacker, the instructions were adequate. The first three interrogatories fully secure the verdict. And the instructions, as you suggested in your question, Judge Rushing, presented it in the alternative. And the jury thought it was answering both. I think it's legally sound for the jury to have answered both as to even the same individuals. You don't need to get into that question about whether there's a statutory inconsistency or a logical inconsistency between prong one termination and reduction like the Leiper court had to do. Does that deal with me on that? So I hope you don't feel compelled, Chief Judge Diaz, to go down that road. The evidence here is fully sufficient to preserve the verdict. And we disagree that they preserved it. I think your Honor's question whether defendants preserved this issue, even if they did preserve this particular subspecies of their objection, the standard, and I guess I'll close with the standard, is whether construed as a whole, the jury was informed of the controlling legal principles without misleading them to the prejudice of the objecting party. And even if they did preserve this kind of objection, it wasn't to their prejudice because the instructions were sound, the verdict was sound regardless. So we would ask for you to please remand the case for the delivery of our remaining fee motion, which is the only thing left over to be adjudicated. Thank you, Your Honors. Thank you very much, counsel. Your Honor, so I want to begin with the question of waiver because I think we can dispense with that fairly quickly. There was no waiver at trial of the or post-trial of the argument that there was not sufficient evidence to support a finding of a single employer under the DOL regulation. At JA290, that's JA290 is the, I think, the party's post or the motions for judgment as a matter of law at the conclusion of the evidence. And at that point, there's several pages, as a matter of fact, of discussion of this very basis that the defendants urged for their motion for judgment as a matter of law, specifically that there was insufficient evidence. And the argument tracks very closely, as the court will see, the arguments that we're making here today. There was several pages of argument there, several pages of response by the plaintiff. And then in the post-trial motion for judgment as a matter of law, the arguments that were made at the close of the evidence were specifically incorporated in that motion. And Chief Judge Diaz, as you noted, the district court was certainly well aware of what those arguments were and engaged with those at some length in its order denying the post-trial motion. So I don't think there's any question that there's waiver here. The theory of waiver that my friend, Mr. Petzonk, has articulated, that there were contradictory arguments or arguments that he viewed as inconsistent that were made at an earlier stage of the case, certainly that's an argument that a party could make, that its opponent has made arguments that are mutually contradictory in some respect. But it does not establish that there's been a waiver. I want to touch broadly, Your Honors, on the expansion of precedent that would occur on the single employer point if the plaintiff was to prevail. We're not aware of any case where a court has applied the Warren Act single employer principle outside the context of a parent subsidiary relationship or, in very narrow circumstances, a lender-borrower relationship. That's a point that was made in the Pennington decision that this court handed down in 2019. And the overarching point there is that when you have separate legal entities, as the five defendants in this case undisputedly are. I thought Pennington was focused on de facto control when it talked about that. That's correct, Your Honor. But there are other factors at issue here. Here, we're not relying solely on de facto control, right? That's correct, Your Honor. My reading of Pennington is that generally, and I think the point that Judge Wilkinson was making there was, the de facto control, I think, undoubtedly is the preeminent factor in the Pennington analysis. I agree with that. I think the broader point that was being made there is that this aggregation of employers into a single employer is unusual. And that when it happens, the precedents where that occurs or has occurred are generally parent subcases as opposed to cases like this, where you have two completely different entities or tabs. And I think generally might be the key word there. Because in Pennington, it said, quote, in the Warnak context, courts have found direct liability in only two circumstances, which is what you're hanging your hat on. But it didn't foreclose liability in other circumstances. It just then addressed, just made that statement and then addressed the factually distinguishable case of Pennington there. I agree with that, Judge Thacker. And my contention is not that Pennington forecloses the application of single employer status in any other circumstance. My point is that we're not aware of any case where that's been done outside of the parent sub or lender borrower context. The plaintiff has not cited any such case in his brief. The plaintiff cited this case. This could be the case. Correct, Your Honor. But we believe that it would be an expansion of precedent and that it would expand precedent in a way, particularly in terms of the reliance on evidence, a lot of which is the subjective impressions of employees at the site, that these were all one company. That is, if that sort of evidence is sufficient to establish single employer status in a Warnak case, then it significantly expands the category of Warnak cases where single employer could apply if the subjective impressions of employees at the work site is a significant enough factor to establish. But I think the jury could also take the testimony, couldn't it, of the employers and then also of Mr. Graham, who was the head of HR and security for somebody. Mr. Graham's testimony, and I see I'm running short of time, and so I'll simply ask the court to look at the joint appendix on this. But as I mentioned earlier, Mr. Graham's testimony was specific to Bluestone. His position was with Bluestone. His discussion of moving equipment and employees around to various parts of the mine site was specific to Bluestone, not to TAMS. And here, critically, TAMS is a separate entity from BRI. I want to touch briefly on the- Didn't he testify about various, that the exchanged employees and that they were on various payrolls and some of the employees at TAMS were on the payroll of other companies? I think, Judge Thacker, what you'll find in the joint appendix in Mr. Graham's testimony is that he actually never mentioned TAMS. Wasn't asked about it, didn't mention it. Right, he didn't mention the word TAMS. That's true. Did he mention Burke Mountain? He, I believe, mentioned Burke Mountain. But again, his position- What is Burke Mountain? What company? Burke Mountain was the mining complex where various parts of the complex- For TAMS? Different companies, including TAMS, had an operation. But the TAMS operation, again, was legally distinct from the others. Chief Judge Diaz, I wanted to come back to your question. I think it is, the math doesn't add up, on the employment loss issue. The parties did agree. I just want to make a few quick points here. Number one, the parties agreed that there were 91 class members, that that was the relevant number for purposes of this analysis. That's page 11 of the opening brief, note three, that explains that. The Lieber case does say that the three categories, the three buckets or types of potential employment loss under the Warren Act are that they are distinct, that those are mutually exclusive, that even though a termination does imply a reduction of hours, that those are not the same thing under the Warren Act. And the problem, the prejudice with the inconsistency here is that it makes the finding of the jury unreviewable because we don't know what the jury found. They found two logically inconsistent things. And therefore, it prevents this court from undertaking a meaningful review of that and prevents us from meaningfully challenging it. How do we not know what they found? We know they found 50 or more were terminated. And we know they found 50 or more had their hours reduced. Correct, Your Honor, but they could not have found both. But they did. We know they did. Yes, Your Honor, but because there's fine. There's no confusion about, well, did only a few jurors find 20 employees and a few found 20 different employees? And we can't add those up because we don't know if they're the same or different employees. None of that is a problem here. Here, the jury found 50 or more. And they found it two ways, right? And a better way of saying it on my part, Your Honor, might be that the jury can't have found or can't with justification, can't viably have found both of those things because there weren't 100 employees. They can't have legitimately found, correctly found, that there were 50 who were terminated and that there were 50 who had their hours reduced. And without knowing which of those things, and I understand Your Honor's point, they did find both, those findings are so mutually inconsistent that it prevents meaningful review of what factual determination the jury actually made them in order to check both those boxes. And if there are no further questions, I think that I'm a bit over time at this point, Chief Justice. Thank you very much, counsel, unless my colleagues have any questions. I do not, nope. Thank you, Your Honors. I want to thank both counsel for their arguments this morning. My colleagues will come down and greet you and then we'll move on to our final case. Thank you.
judges: Albert Diaz, Stephanie D. Thacker, Allison J. Rushing